**LITTLER MENDELSON**
A Professional Corporation
One Newark Center, 8th Floor
Newark, New Jersey 07102
973.848.4700
Attorneys for Plaintiff

| | |
|---|---|
| BIO-REFERENCE LABORATORIES, INC.<br><br>Plaintiff,<br><br>vs.<br><br>ALVEAR BENROS and SHIEL MEDICAL LABORATORY, INC.,<br><br>Defendants. | **UNITED STATES DISTRICT COURT<br>DISTRICT OF NEW JERSEY**<br><br>Civil Action No. [**to be assigned**]<br><br>**COMPLAINT FOR INJUNCTIVE AND LEGAL RELIEF** |

Plaintiff, Bio-Reference Laboratories, Inc. ("Bio-Reference"), a New Jersey Corporation, by way of this Verified Complaint against the Defendants, alleges as follows:

### NATURE OF ACTION, JURISDICTION & VENUE

1. This is an action for injunctive and legal relief to enforce a post-employment customer non-solicitation agreement, to enjoin the harm caused by Bio-Reference's former employee's breach of his contractual and common law duties of loyalty and confidentiality to Bio-Reference, and to remedy the harm caused towards Bio-Reference by its former employee's new employer.

2. This Court has jurisdiction pursuant to 28 U.S.C. § 1332 in that this action is between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interests and costs.

3. Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391 in that Plaintiff resides in this jurisdiction and a substantial part of the events giving rise to the claims herein occurred in this judicial district.

## THE PARTIES

4. Bio-Reference is a corporation existing under the laws of the state of New Jersey, with its headquarters and principal place of business located at 481 Edward H. Ross Drive, Elmwood Park, New Jersey.

5. Defendant Alvear Benros ("Benros") is an individual whose residence is 228 Waterside Close, Peekskill, New York, 10566.

6. Defendant Shiel Medical Laboratory, Inc. ("Shiel") is a New York corporation, having its principal place of business located at 63 Flushing Avenue, Unit 336, Brooklyn, New York, 11205. Shiel is a clinical laboratory that provides physicians and patients in the tri-state area with clinical laboratory testing services and directly competes with Bio-Reference for client accounts in the medical testing industry.

## FACTS RELEVANT TO THE CLAIMS

7. Bio-Reference is a multi-faceted health service corporation and the largest regional clinical laboratory in the Northeastern United States.

8. Bio-Reference primarily tests medical specimens that it receives from hospitals, clinics, correctional institutions, government agencies, physicians' offices, drug treatment centers and nursing homes located throughout the United States, including within the States of New York, New Jersey, and Pennsylvania.

9. The clinical laboratory and medical testing market in which Bio-Reference operates is highly competitive, and Bio-Reference's commercial and financial success depends

upon, among other things, its reputation, customer good-will and effective, responsive customer service.

10. In or around 1998, Benros joined Medilabs Inc. ("Medilabs") as a sales representative.

11. In March 2001, Bio-Reference acquired Medilabs and consolidated Medilabs' operations and employees into Bio-Reference, at which time Benros commenced employment with Bio-Reference as a sales representative.

12. As a sales representative, Benros was assigned to market, sell, and service Bio-Reference's clinical testing services to physicians, correctional institutions, hospitals and clinics located throughout New York and New Jersey.

13. During his employment with Bio-Reference, Benros had extensive contact with Bio-Reference's customers and customer prospects as well as access to confidential information about such customers and customer prospects.

14. Bio-Reference encouraged and compensated Benros to develop an intimate knowledge of its customers' needs, preferences and plans, and establish a close relationship with the customers' key contact personnel.

15. Benros also had access to other Bio-Reference confidential information including, but not limited to, Bio-Reference's pricing structures, marketing plans, and other details pertaining to customer accounts that are not generally known to the public.

16. In or around March 2003, Benros executed a Bio-Reference Key Employment Agreement ("Employment Agreement") with Bio-Reference in consideration for, *inter alia*, being granted 2000 Bio-Reference common stock options and continued employment.

17. Among other provisions, Section 6(B) of the Employment Agreement restricts Benros' right to disclose or use any of Bio-Reference's confidential information, as that term is defined in the Employment Agreement. Specifically, Benros acknowledged and agreed that:

> During Employee's employment and for an unlimited period following the termination of Employee's employment with the Company, whether termination is voluntary or involuntary, and regardless of the reason therefore, Employee shall not, without the express written consent of Company, directly or indirectly, by Employee or through any other person, firm, partnership, corporation, entity or enterprise:
>
> (1) disclose or use, in any manner, or allow to be disclosed or used in any manner, "Confidential Information."

18. Section 5 of the Employment Agreement defines "Confidential Information" as:

> information not generally or publicly known or readily available to the public, and proprietary to the Company, including, without limitation, information relating to past, present or prospective customers, vendors, suppliers and distributors; marketing, merchandising or servicing techniques, methodologies and procedures; manuals; letters; reports; notes; price schedules; memoranda and correspondence; product lists; financial records; computer programs, systems or modes; contracts and the content of negotiations culminating in such contracts, including any records thereof.

19. The Employment Agreement also imposes restrictions upon Benros with regard to Bio-Reference customer accounts. Specifically, Section 6(A) of the Employment Agreement provides, in relevant part:

> Employee recognizes and acknowledges that Confidential Information, and relationships with Employee's actual customers and prospective customers, for which Employee will work and perform services or has worked and performed services as an employee of Company are valuable, special, and unique aspects of Company's business, which have been created and developed at great time, effort and expense to the Company. Employee acknowledges that this "Confidential Information," and these existing and prospective customer relationships are not transitory and will not soon be obsolete.
>
> A. Accordingly, during Employee's employment and for a period of one (1) year following the termination of Employee's employment with the Company, whether termination is voluntary or involuntary, and regardless of the reason therefore, Employee shall not, without the express written consent of Company, directly or indirectly, by Employee or through any other person, firm,

4

partnership, corporation, entity or enterprise:

(1) make or derive any sales from any customer or prospective customer of the Company that Employee solicited, serviced, was responsible for or interacted with while employed by the Company.

20. By executing the Employment Agreement, Benros acknowledged in Section 7 thereof that:

(1) compliance with the restrictive covenants contained in Section 6 of [the Employment] Agreement is necessary to protect [Bio-Reference's] business and goodwill . . . and (2) a breach of Section 6 will result in irreparable and continuing damage to [Bio-Reference] for which money damages may not provide adequate relief. Consequently, Employee agrees that, in the event Employee breaches or threatens or attempts to breach the restrictive covenants contained in Section 6, Company shall be entitled to both: (1) a temporary restraining order, preliminary injunction and permanent injunction in order to prevent such harm; and (2) money damages as may be determined.

21. Benros further acknowledged in Section 9 of the Employment Agreement that its terms "shall be governed by the internal laws of the State of New Jersey, without giving effect to its conflict of law principles [and that] [t]he courts of the State of New Jersey shall have jurisdiction over any disputes arising under this Agreement, and each of the parties hereby consents to such exercise of jurisdiction."

22. The Employment Agreement explicitly states, at Section 9, that "[i]f either party to [the] Agreement breaches any of the terms of the Agreement, that party shall pay to the non-defaulting party all of the non-defaulting party's costs and expenses incurred in enforcing the terms of this Agreement, including its attorneys' fees."

23. Benros voluntarily resigned his employment with Bio-Reference effective April 28, 2008.

24. When questioned about his future intentions, Benros refused to disclose his anticipated employment plans.

25. Almost immediately after he voluntarily resigned, Benros commenced employment with Shiel as a sales representative. Upon information and belief, Benros currently works for Shiel in the geographic area that he serviced during his Bio-Reference employment.

26. Upon information and belief, and without Bio-Reference's authorization, Benros has used, and continues to use, Bio-Reference's confidential information including, but not limited to, information concerning Bio-Reference's current and prospective clients, client specific billing rates, client cash receipts, bidding and sales strategy, client needs, and operational strategy to solicit and obtain business from Bio-Reference's customers for the benefit of himself and Shiel.

27. Upon information and belief, since resigning his employment with Bio-Reference Benros has contacted and solicited in breach of his Employment Agreement numerous Bio-Reference customer accounts -- the same accounts that he solicited, serviced, was responsible for or interacted with during some or all of his Bio-Reference employment.

28. To date, at least one former Bio-Reference client to which Benros was assigned during his Bio-Reference employment has transferred its business from Bio-Reference to Shiel as a result of Benros' improper actions. Specifically, on or about May 12, 2008, Howard Beach Medical Center severed its business relationship with Bio-Reference and transferred its medical testing work, in whole or in part, to Shiel.

29. Bio-Reference's anticipated total lost annual revenues from this former client exceeds $140,000, and is expected to increase as Benros and Shiel continue to exploit Bio-Reference's Confidential Information and the valuable customer and client relationships that Benros developed over time and at Bio-Reference's expense by, among other things, improperly using Bio-Reference's customer pricing information.

30. Upon information and belief, Benros has also improperly and for improper purposes contacted numerous other current Bio-Reference customers including, but not limited to, those listed below, in an effort to divert their business improperly from Bio-Reference to Shiel:

    a.    Meadowview Psychiatric Hospital;

    b.    Hudson Medical Laboratories;

    c.    The offices of Dr. Ilisa D. Wallach, M.D.;

    d.    The offices of Dr. Frank M. Cardello, M.D.;

    e.    The offices of Dr. David Lans;

    f.    South Ocean Care;

    g.    The offices of Dr. Kaliyur Venkat;

    h.    The offices of Dr. P. M. Spryropoulos;

    i.    Clinica Central; and

    j.    The offices of Pushpa P. Lalaji, M.D.

31. On May 15, 2008, counsel for Benros and Shiel acknowledged to Bio-Reference's counsel that Benros was bound by the terms of the Employment Agreement, including the post-employment restrictive covenants contained therein.

32. By letter dated May 20, 2008, counsel for Bio-Reference restated to Benros' and Shiel's attorney the terms of Benros' post-employment legal and contractual obligations to Bio-Reference and requested confirmation whether Benros intended to comply with and notify Shiel about same. A true and correct copy of the May 20, 2008 letter is attached hereto as **Exhibit A**.

33. Upon information and belief, since May 20, Benros continues to violate the terms of the Employment Agreement by, among other things, making or deriving sales from Bio-Reference customers and accounts on his and/or Shiel's behalf.

## COUNT I

## (BREACH OF CONTRACT – BENROS)

34. Bio-Reference repeats and realleges the allegations set forth in paragraphs 1-33, above.

35. By improperly disclosing and exploiting the confidential information to which he had access while employed by Bio-Reference to misappropriate Bio-Reference's customers, Benros has breached, and continues to breach, his Employment Agreement with Bio-Reference

36. By reason of Benros' disclosure and exploitation of Bio-Reference's confidential and proprietary information to solicit and obtain Bio-Reference's customers on behalf of and to the benefit of Shiel and himself, Bio-Reference has suffered, and will continue to suffer, severe and immediate harm for which there is no adequate remedy at law.

37. Unless Benros is restrained and enjoined from making or deriving sales from any customer of Bio-Reference that he solicited, serviced was responsible for or interacted with while employed by Bio-Reference, Bio-Reference will suffer severe, continued, and immediate harm, for which there is no adequate remedy at law.

## COUNT II

### (TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE - BENROS)

38. Bio-Reference repeats and realleges the allegations set forth in paragraphs 1-37, above.

39. By making or deriving sales from Bio-Reference customers that he serviced or was responsible for during his Bio-Reference employment, and causing them to terminate their business relationship with Bio-Reference and to thereafter transact business with Shiel, Benros has tortiously interfered with the prospective business advantage between Bio-Reference and its customers.

40. Benros' actions towards Bio-Reference's customers was done intentionally and without legal justification or excuse.

41. Bio-Reference reasonably anticipated certain economic benefits from its relationships with its customers and, in the absence of Benros' wrongful conduct, Bio-Reference would have derived and obtained those economic benefits.

42. The loss of its customers and the deprivation of its anticipated economic benefits has caused Bio-Reference to suffer damages.

## COUNT III

### (BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING - BENROS)

43. Plaintiff repeats and realigns the allegations set forth in paragraphs 1-42, above.

44. By his actions, Benros has breached the implied covenant of good faith and fair dealing contained in the Employment Agreement.

45. Benros' actions have caused Bio-Reference to suffer damages.

## COUNT IV

### (TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE – SHIEL MEDICAL LABORATORY, INC.)

46. Bio-Reference repeats and realleges the allegations set forth in paragraphs 1-45, above.

47. By accepting customers of Bio-Reference unlawfully obtained by Benros and by causing them to terminate their business relationship with Bio-Reference and transact business with Shiel, Shiel, through Benros and others, has tortiously interfered with the prospective business advantage between Bio-Reference and its customers.

48. Shiel's acceptance of Bio-Reference's customers was done intentionally and without legal justification or excuse.

49. Bio-Reference reasonably anticipated certain economic benefits from its relationships with its customers and, in the absence of Shiel's wrongful conduct, Bio-Reference would have derived those economic benefits.

50. The loss of its customers and the deprivation of its anticipated economic benefits has caused Bio-Reference to suffer damages.

**WHEREFORE**, Bio-Reference seeks judgment against Benros and Shiel for the following relief:

A. A preliminary injunction and a permanent injunction enjoining and restraining Benros and Shiel, for a period of twelve (12) months from the date on which said permanent injunction is entered, as follows:

    (i)  From directly or indirectly making or deriving any sales from any customer or prospective customer of Bio-Reference that Benros solicited, serviced, was responsible for or interacted with during his Bio-Reference employment;

    (ii)  From disclosing or using in any way, either directly or indirectly, any confidential information of Bio-Reference Laboratories, Inc., including, but not limited to, customer lists, information relating to customers (including customer or selling locations, identification of customer contacts, customer buying histories, and product requirements), sales manuals, notes or memoranda containing customer information, pricing and commission information;

  B.  An order directing Benros and Shiel to return all documents, materials and things in his and its possession that are the property of Bio-Reference Laboratories, Inc. owned and/or purchased by Bio-Reference;

  C.  Lost profits;

  D.  An accounting of profits earned by Shiel Medical Laboratory, Inc. and/or Benros and a disgorgement of such profits;

  E.  Consequential damages;

  F.  Punitive damages;

  G.  Attorneys' fees and costs incurred by Bio-Reference in enforcing the Employment Agreement, pursuant to Section 9 of the Agreement; and

H.   Such other and further relief as the Court may deem just and reasonable.

                                                **LITTLER MENDELSON, P.C.**
                                                Attorneys for Plaintiff

                                                By: _/s/ Bryan Churgin_

Dated: June 9, 2008

Firmwide:85345242.3 051146.1008

# EXHIBIT A

# LITTLER MENDELSON®
A PROFESSIONAL CORPORATION

May 20, 2008

David M. Wirtz
Direct: 212.583.2699
Direct Fax: 646.219.5834
dwirtz@littler.com

**CERTIFIED MAIL, R.R.R.
AND FIRST-CLASS MAIL**

Martin H. Gelber, Esq.
Klein & Solomon, LLP
275 Madison Avenue
New York, New York 10016

Re:  Bio-Reference Laboratories, Inc. (Alvear Benros)

Dear Mr. Gelber:

This is to follow up from your recent email communication with Bryan Churgin in our New Jersey office.

More specifically, we agree that Mr. Benros is bound by a subsequent agreement he entered into with Bio-Reference Laboratories, which supersedes his Medilabs agreement, and which provides in relevant part as follows with regard to his post-employment obligations:

> 5.  As used in this Agreement, "Confidential Information" is defined as information not generally or publicly known or readily available to the public, and proprietary to the Company, including, without limitation, information relating to past, present or prospective customers, vendors, suppliers and distributors; marketing, merchandising or servicing techniques, methodologies and procedures; manuals; letters; reports; notes; price schedules; memoranda and correspondence; product lists; financial records; computer programs, systems or modes; contracts and the content of negotiations culminating in such contracts, including any records thereof. This paragraph shall not apply to any Confidential Information which is or becomes generally available to the public for reasons other than as a result of disclosure which is prohibited under this or any agreement.
>
> 6.  Employee recognizes and acknowledges that Confidential Information, and relationships with Employee's actual customers and prospective customers, for which Employee will work and perform services or has worked and performed services as an employee of Company are valuable, special, and unique aspects of Company's business, which have been created and developed at great time, effort and expense to the Company. Employee

ALABAMA
ARIZONA
ARKANSAS
CALIFORNIA
COLORADO
CONNECTICUT
DISTRICT OF COLUMBIA
FLORIDA
GEORGIA
ILLINOIS
INDIANA
MASSACHUSETTS
MINNESOTA
MISSOURI
NEVADA
NEW JERSEY
NEW YORK
NORTH CAROLINA
OHIO
OREGON
PENNSYLVANIA
RHODE ISLAND
SOUTH CAROLINA
TEXAS
VIRGINIA
WASHINGTON

THE NATIONAL EMPLOYMENT & LABOR LAW FIRM™
885 Third Avenue, 16th Floor, New York, New York 10022.4834  Tel: 212.583.9600  Fax: 212.832.2719  www.littler.com

Martin H. Gelber, Esq.
May 20, 2008
Page 2

acknowledges that this "Confidential Information," and these existing and prospective customer relationships are not transitory and will not soon be obsolete.

    A.    Accordingly, during Employee's employment and for a period of one (1) year following the termination of Employee's employment with the Company, whether termination is voluntary or involuntary, and regardless of the reason therefore, Employee shall not, without the express written consent of Company, directly or indirectly, by Employee or through any other person, firm, partnership, corporation, entity or enterprise:

    (1)    make or derive any sales from any customer or prospective customer of the Company that Employee solicited, serviced, was responsible for or interacted with while employed by the Company;

    (2)    induce, approach or attempt to induce any employee of the Company to leave the Company and become professionally affiliated with and/or work for or with Employee or at Employee's new employer.

    B.    Further, during Employee's employment and for an unlimited period following the termination of Employee's employment with the Company, whether termination is voluntary or involuntary, and regardless of the reason therefore, Employee shall not, without the express written consent of Company, directly or indirectly, by Employee or through any other person, firm, partnership, corporation, entity or enterprise:

    (1)    disclose or use, in any manner, or allow to be disclosed or used in any manner, "Confidential Information."

    C.    The time restrictions set forth herein shall run from the date of Employee's termination of employment for any reason, except that if Employee violates this Agreement, such time restrictions shall commence on the date of compliance with the restrictions contained herein, whether such compliance is voluntary or compelled.

    7.    Employee acknowledges that: (1) compliance with the restrictive covenants contained in Section 6 of this Agreement is necessary to protect the business and goodwill of Company; and (2) a breach of Section 6 will result in irreparable and continuing damage to Company for which money damages may not provide adequate relief. Consequently, Employee agrees that, in the event Employee breaches or threatens or attempts to breach the restrictive covenants contained in Section 6, Company shall be entitled to

Martin H. Gelber, Esq.
May 20, 2008
Page 3

both: (1) a temporary restraining order, preliminary injunction and permanent injunction in order to prevent such harm; and (2) money damages as may be determined. Nothing in this Agreement shall be construed to prohibit Company from also pursuing any other remedy, the parties agreeing that all remedies are cumulative.

8.  All originals and photocopies or any other form of reports, memoranda, manuals, letters, books, computer records and printouts, customer lists, sales records, and any other material and/or equipment furnished to and/or maintained by Employee in connection with Employee's employment by Company shall remain the property of the Company and shall be returned to the Company: (1) upon demand; or (2) immediately upon termination of employment.

9.  If any clause or provision herein shall be adjudged invalid or unenforceable by a court of competent jurisdiction or by operation of any applicable law, it shall not affect the validity of any other clause or provision, which shall remain in full force and effect. This Agreement shall be governed by the internal laws of the State of New Jersey, without giving effect to its conflict of law principles. The courts of the State of New Jersey shall have jurisdiction over any disputes arising under this Agreement, and each of the parties hereby consents to such exercise of jurisdiction. If either party to this Agreement breaches any of the terms of this Agreement, that party shall pay to the non-defaulting party all of the non-defaulting party's costs and expenses incurred in enforcing the terms of this Agreement, including its attorneys' fees.

10. The parties have attempted to limit Employee's activities only to the extent necessary to protect the Company from unfair competition. The parties recognize, however, that reasonable people may differ in making such a determination. Consequently, the parties hereby agree that, if the scope or enforceability of the restrictive covenants contained herein are in any way disputed at any time, a court or other trier of fact may modify and enforce such covenants to the extent that it believes to be reasonable under the circumstances existing at that time.

12. The Company shall have the right to assign any rights or obligations under this Agreement without the prior written approval of Employee. The Employee shall not have the right to assign rights or obligations under this Agreement. However, subject to the provisions of this Paragraph, in the event of a "change in control" of the Company, the restrictions set forth in Paragraph 6A of this Agreement shall be shortened to

Martin H. Gelber, Esq.
May 20, 2008
Page 4

six (6) months only. For purposes of this provision, a "change in control" shall mean: (i) the sale of substantially all of the Company's assets; or (ii) the sale of more than fifty percent (50%) of the Company's issued and outstanding common stock; or (iii) the Company's merger, consolidation and/or combination with another entity in which the Company is not the surviving entity

13. This Agreement contains the entire agreement of the parties as to the subject matter hereof and supersedes all prior written and oral agreements and understandings between the parties as to such subject matter. This Agreement may not be modified, changed or altered by any oral promise or statement by whomever made, nor shall any written modifications of this Agreement be binding on the Company unless such modification shall have been approved in writing by an officer of the Company.

We would appreciate confirmation from you that the foregoing accurately describes Mr. Benros's contractual obligations to Bio-Reference Laboratories, and that he intends to comply with those obligations, and that he has made them known to his current employer. We are not as sanguine as you are that he has done so to date, however, and we urge you to revisit these obligations with him at your earliest convenience. We are also unaware that anyone from Bio-Reference Laboratories is calling Mr. Benros at all, let alone with an intention to harass him. If you have something more specific that you would like us to review, please advise.

I look forward to hearing from you.

Very truly yours,

LITTLER MENDELSON

David M. Wirtz

cc: Bio-Reference Laboratories, Inc.